UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Salvatore Davi,

**MEMORANDUM & ORDER**

Plaintiff,

16-cv-5060 (ERK)

– against –

Samuel D. Roberts, Commissioner, New
York State Office of Temporary and
Disability Assistance, in his individual and
official capacity, *et al.*,

Defendants.

KORMAN, *J.*:

This case arises out of a Facebook argument about the value and efficacy of

welfare benefits.   Plaintiff Salvatore Davi, a hearing officer at a state agency

responsible for reviewing denials of welfare benefits, commented on an article

posted by a law school classmate.  Davi agreed that "there should most certainly be

a safety net, but it should be of limited duration and designed to get people back to

self-sufficiency."  Among other comments in a similar vein, he added that it was not

"the government's job to subsidize laziness and failure" and that "I have zero

sympathy for anyone who refuses to work and/or get the education or training to

earn a livable wage." After his law school classmate took issue with this observation

and engaged in a heated argument, she sent his employer a complaint, which

highlighted Davi's comments and indicated a copy was being sent to a legal group

1

representing benefit recipients.   The agency suspended Davi from overseeing hearings and ultimately sought to terminate him—a penalty that was modified by an arbitrator, who reduced it to a six-month unpaid suspension and a reassignment to a position at the same pay level that did not involve public contact.   The arbitrator did so even though an investigation revealed that Davi's decisions showed no bias against benefit applicants.   On the contrary, it revealed "empirical data of his ability to make an unbiased recommendation on all proceedings in his jurisdiction," namely that he ruled in applicants' favor in an overwhelming 95% of cases.   Indeed, Davi's supervisors not only spoke to his "unbiased approach to his job" and "his value as an employee," but also "praised his work ethics, his sense of responsibility, his intelligence, his demeanor and clearly felt he was an overall asset to the office."

After his challenge to the arbitrator's decision in state court was rejected, Davi filed this lawsuit alleging that this discipline constituted unlawful retaliation in violation of the First Amendment.   Defendants are various agency employees sued in their official and individual capacities.   The parties have filed cross motions for summary judgment, which I proceed to address in some detail below.

## BACKGROUND

Beginning in 2010, plaintiff Salvatore Davi was a hearing officer at the New York State Office of Temporary and Disability Assistance ("OTDA").   OTDA defines its mission as enhancing the economic security of low-income New Yorkers,

2

including through the provision of public benefits, "with a focus on employment wherever possible."  As a hearing officer—what OTDA also calls an administrative law judge—Davi reviewed the denial or reduction of welfare benefits by social service districts that make initial decisions on applicants' eligibility for benefits, including food stamps, disability benefits, and other forms of supplemental income. Defendants' 56.1 Resp. ¶¶ 16, 18, ECF No. 92; *see also* N.Y. Comp. Codes R. & Regs. tit. 18, §§ 358-2.9, 358-3.1, 358-5.6.

While the hearing officers' responsibility could encompass more, the hearings Davi held were generally limited to such matters as whether applicants who had been denied benefits had submitted documents requested by an agency; whether they appeared at appointments to discuss their eligibility for benefits; and whether the applicants satisfied income and eligibility thresholds.  Defendants' 56.1 Resp. ¶ 23; ECF Nos. 82 at ¶ 19; 83-11 at 25–27; *see also Lisnitzer v. Zucker*, 983 F.3d 578, 581 (2d Cir. 2020).    Davi recommended that applicants receive benefits (*i.e.*, recommended the reversal of denials or reductions in benefits) in 95% of cases.  ECF No. 83-24 at 11, 14.  These rulings were recommendations subject to review by a supervisor.

On October 28, 2015, Davi responded to an article that had been posted on the personal Facebook page of someone he knew.  The article was from the website Daily Kos and entitled "Anti-poverty programs like food stamps are working.  Let's

expand them, not make more cuts."[1]  Davi and a law school classmate, Erin Lloyd,

then had an argument in the comments of the Facebook post.  Both the Facebook

post and the argument appear not to have been accessible to the general public.  ECF

No. 83-8 at 105–07.  Because the context is significant, I reproduce the relevant

portion of their conversation verbatim (without correcting spelling or grammar):

> **DAVI**: This article and the underlying study use the wrong metric.  These
> programs should be judge by how many people or families they get back on
> their feet and off government assistance, not how well these programs enable
> their recipients to be poor and collect government assistance for the rest of
> their lies.

> **LLOYD**: "enable their recipients to be poor" – RIGHT! of course! people
> who need $150/mo to get their basic food needs met are just being
> ENABLED!  The goal of any public assistance program should be to AID the
> poor.  It's the job of politicians and employers to… [*See more*][2]

> **DAVI**: Says who?  Where does it say ANY of that in the Constitution? It is
> not the government's job to subsidize laziness and failure.  I agree that there
> should most certainly be a safety net, but it should be of limited duration and
> designed to get people back to self-sufficiency.  But I have zero sympathy for
> anyone who refuses to work and/or get the education or training to earn a
> living wage.

> This country has turned welfare into a generational career path!

---

[1]   *See* https://www.dailykos.com/stories/2015/10/27/1440684/-Anti-poverty-programs-like-food-stamps-are-working-Let-s-expand-them-not-make-more-cuts.

[2]   This comment is abridged in the copy sent with the anonymous complaint to
Davi's employer.  The full comment is available elsewhere in the record and
is not necessary to follow the conversation.  *See* ECF No. 90-22 at 3.

At this point, the conversation turned personal and nasty.  Lloyd told the defendant "I remember your bullshit from law school, so I've got no patience for you.  Who brought up the constitution?  Not me.  I didn't say a word about the law.  I'm talking MORALS, my friend."  Davi responded: "If you are going to be that nasty then fuck you, too.  Your 'morals' suck because they create an underclass dependent on government handouts that translates into generational poverty, while at the same time taxing productive members of our society to the breaking point." ECF No. 83-1 at 4.

On November 4, 2015, OTDA received an anonymous complaint claiming falsely to have observed this discussion on a mutual friend's Facebook page and enclosing a copy of it.  The complainant—who claimed not to personally know Davi but who was later revealed to be Lloyd herself—called Davi's comments "wholly unethical and expose a severe bias against many of the individuals who may be coming before him" as an administrative law judge.  She urged OTDA "to conduct an investigation," including into "whether past rulings reflect bias against benefit recipients."  The letter indicated that a copy was being sent to Project Fair of the Legal Aid Society, which provides pro bono representation to benefit applicants appearing before OTDA's administrative law judges. As Defendants note, "[a]nyone who passes through the lobby of the building on their way to a Fair Hearing has an opportunity to meet with Project Fair staff to ask questions or request

representation." ECF No. 93 at 4.

On November 5, OTDA's senior staff held a meeting to discuss the complaint and agreed to remove Davi from the hearing calendar pending the outcome of their investigation. OTDA's assistant deputy commissioner (who participated in that meeting) testified that the participants decided on that day to suspend Davi without pay, but that they waited one week to do so because "[g]eneral office practice is to afford an opportunity to [the] employee to be interviewed." ECF No. 83-8 at 62. That same day, OTDA's director listened to recordings of ten of Davi's hearings and wrote in an email that he found Davi "polite in every case" and that he "was fair and provided clients with good advice and explanations." ECF No. 83-19; *see* ECF No. 88 at ¶ 9. On November 10, the director provided an update that he had found nothing to contradict that initial assessment. ECF No. 83-19. Indeed, the investigation revealed that Davi awarded public benefits to applicants in approximately 95% of the hundreds of cases he reviewed each month. *See* ECF No. 83-24 at 11, 14.

Around that same time, OTDA's director called an acquaintance at Legal Aid and asked if he had heard any "scuttlebutt" about hearing officers, presumably to determine if Legal Aid had received the complaint and, if so, how it intended to

respond.[3]  ECF No. 88 at ¶ 10.  His Legal Aid contact replied that he had not heard anything.  *Id.*  On November 13, OTDA interviewed Davi and, at the end of the interview, suspended him without pay pending a formal notice of discipline, effective immediately.  On November 18, OTDA contacted Lloyd, who confirmed that she had sent the complaint and said that she had sent a copy to Legal Aid.  No benefit applicant sought Davi's recusal based on his remarks, even though OTDA sent out hearing notices for mid-November and early December 2015 that indicated he would be the hearing officer.  Defendants' 56.1 Resp. ¶ 77; ECF No. 83-18; ECF No. 83-11 at 52–53.  Nor did any applicant seek reconsideration of any adverse rulings in the months after Legal Aid was sent Davi's comments.

Having determined that Davi was unbiased and that his comments were unlikely to cause disruption, OTDA nevertheless sent Davi a notice of discipline on December 29 proposing to terminate his employment on the ground that the comments created an appearance of bias and reflected actual bias.  Davi's union challenged the discipline in binding arbitration.  The arbitrator dismissed the agency's claims that Davi was biased, finding "[t]here was no evidence offered that [Davi] was biased in conducting hearings assigned to him nor did he have any

---

[3]     Legal Aid would also have been a source for general information about OTDA's hearing officers in light of the fact that it offered pro bono representation to appellants appearing before those hearing officers—and indeed, because Legal Aid had offices in the same building as OTDA.

involvement in any [action] before him."  ECF 83-24 at 7, 13.  He further concluded

that:

> [Davi] has been employed as a hearing officer since March 2010, and his decisions reveal no bias.  All of his previous supervisors who had the responsibility of signing his recommendations testified that they never detected any bias in his recommendations.  The record shows that he has ruled in favor of the clients 95% of the time, thus providing empirical data of his ability to make an unbiased recommendation on all proceeding in his jurisdiction.
>
> Not only did his supervisors speak to his unbiased approach to his job but also to his value as an employee.  They praised his work ethics, his sense of responsibility, his intelligence, his demeanor and clearly felt he was an overall asset to the office.

*Id.* at 14.

The arbitrator nonetheless upheld the charge that Davi's comments created an

appearance of bias because Legal Aid was now "armed with information that would

severely discredit the premise of impartiality of [Davi] and by extension, that of the

agency."  *Id.* at 13.  The arbitrator concluded that it was "not believable" to assume

that Legal Aid "would not use the public words of [Davi] in an effort to either not

allow [Davi] to decide the fate of their clients or to appeal an adverse

recommendation," crediting OTDA's purported concern that his comments would

cause disruption.  *Id.*  He determined that Davi's conduct warranted discipline but

concluded that the proper punishment was six months' suspension followed by a

transfer to another position at the same pay grade (which "need not include the duties

of a hearing officer").  *Id.* at 14–15.  The arbitrator did not explain how suspending

Davi for six months without pay would address the agency's concern that his Facebook comments would disrupt its operations.

Davi sought to vacate the arbitration award in an Article 75 proceeding, which was denied on the ground that he lacked standing because he was not a party to the arbitration. Following his suspension, Davi was transferred to the role of senior attorney at OTDA, where his responsibilities include litigation, keeping abreast of developments affecting hearing officers, and reviewing requests for recusal of hearing officers. Both during and after his suspension, Davi applied for jobs at OTDA as a supervising hearing officer or hearing officer, which he did not receive.

Under these circumstances, the issue presented by Davi's complaint and his motion for partial summary judgment is whether OTDA and its supervising officials unlawfully retaliated against him. He seeks equitable relief to reinstate him to his former position. Defendants seek summary judgment on the theory that their actions were constitutional and, in the alternative, that the individual defendants are entitled to qualified immunity.

## STANDARD OF REVIEW

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Id.* at 325. Once the movant meets its initial burden, the non-moving party may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See Anderson*, 477 U.S. at 250.

## DISCUSSION

A public employee claiming retaliation based on his speech must demonstrate (1) his speech was protected by the First Amendment; (2) the defendant took adverse action against him; and (3) there was a causal connection between the adverse action and the protected speech. *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018). Defendants concede that they took adverse action against Davi. ECF No. 93 at 8. Nor do they dispute the causal connection between Davi's speech and the adverse action taken against him.

The Supreme Court has long recognized that government employees do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of" their employment. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). "At the same

time, however, 'the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Lynch v. Ackley*, 811 F.3d 569, 577 (2d Cir. 2016) (quoting *Pickering*, 391 U.S. at 568).  Thus, the Supreme Court has recognized that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

To balance these interests, the Supreme Court has applied a "two-step inquiry into whether a public employee's speech is entitled to protection." *Lane v. Franks*, 573 U.S. 228, 237 (2014).  First, as a threshold matter, the employee must have spoken "as a citizen on a matter of public concern," rather than pursuant to his official duties or based on a personal grievance related to his employment. *Id.* If he has, the question is then "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418.  The employee may nonetheless prevail if he shows that the government retaliated against him for the content of his speech rather than because of the justifications it has offered. *Melzer v. Bd. of Educ.*, 336 F.3d 185, 193 (2d Cir. 2003).

## I.   <u>Davi's Claims Are Not Procedurally Barred</u>

As an initial matter, I reject Defendants' argument that Davi is precluded from relitigating the issues decided by the arbitrator or that his claims are otherwise barred from federal-court review.   First, Defendants argue that Davi is precluded from challenging the arbitrator's finding that he was disciplined because of the risk of disruption.   The Supreme Court has long held, however, that arbitrations pursuant to a collective bargaining agreement do not preclude re-litigation of the issues or claims in a subsequent suit under § 1983.   *McDonald v. City of West Branch*, 466 U.S. 284, 287–90 (1984).   Thus, the arbitrator's decision is not entitled to issue-preclusive effect.   *See Wilson v. New York*, 2018 WL 1466770, at *8–9 (E.D.N.Y. Mar. 26, 2018) (Amon, *J.*) (applying *McDonald* to deny preclusive effect to arbitrator's decision) (citing *Siddiqua v. N.Y. State Dep't of Health*, 642 F. App'x 68, 70 (2d Cir. 2016)).

Likewise, the *Rooker-Feldman* doctrine, which bars federal-court review of "cases brought by state-court losers complaining of injuries caused by state-court judgments[,]" is inapplicable.   *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 285 (2005).   Davi's harm arose from Defendants' conduct, not the state court's dismissal of his petition, and *Rooker-Feldman* does not apply when "the exact injury of which the party complains in federal court existed *prior* in time to the state-court proceedings, and so could not have been 'caused by' those proceedings."   *McKithen v. Brown*, 481 F.3d 89, 98 (2d Cir. 2007) (emphasis in

original); *see also Cho v. City of New York*, 910 F.3d 639, 647 (2d Cir. 2018).  I therefore turn to the merits.

## II.     Davi Spoke As a Citizen on a Matter of Public Concern

Davi easily satisfies *Pickering*'s first step: he spoke as a citizen on a matter of public concern, which are both issues determined as a matter of law.  *See Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).  Defendants appropriately concede that Davi spoke as a citizen.  ECF No. 93 at 9.

Davi likewise spoke on a matter of public concern.  A "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004).  That includes speech that relates to "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).  By contrast, "speech that primarily concerns an issue that is personal in nature and generally related to the speaker's own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern." *Gorman v. Rensselaer Cty.*, 910 F.3d 40, 45 (2d Cir. 2018) (internal quotation omitted).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.

The Supreme Court has repeatedly held that speech on the appropriate

generosity of government benefits is a matter of public concern.  In *Harris v. Quinn*, 573 U.S. 616 (2014), the Court held that, under the *Pickering* test, "it is impossible to argue that the level of Medicaid funding (or, for that matter, state spending for employee benefits in general) is not a matter of great public concern."  *Id.* at 654. Similarly, in *Rankin v. McPherson*, 483 U.S. 378 (1987), the Court held that a clerical employee's speech was protected when she was overheard saying, after learning of an attempt on President Reagan's life, that because the President was "cutting back Medicaid and food stamps . . . if they go for him again, I hope they get him."  *Id.* at 381.  The Court concluded that the employee spoke on a matter of public concern in part because her statement "was made in the course of a conversation addressing the policies of the President's administration."  *Id.* at 386 & n.10.  Likewise, the Second Circuit has emphasized that "discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern."  *Harman v. City of New York*, 140 F.3d 111, 118 (2d Cir. 1998) (internal quotation and alteration omitted).  In sum, Davi's argument that public benefits should be limited in scope is speech on a quintessential matter of public concern.

Defendants have two rejoinders, but neither is persuasive.  First, they argue that Davi's comments were not on a matter of public concern because they were made on a personal Facebook page that was not accessible to the general public.  But the "public concern" test is largely focused on what the employee says, not how

widely disseminated his remarks are.  The Supreme Court has "recognized that certain private remarks . . . touch on matters of public concern and should thus be subject to *Pickering* balancing."  *Roe*, 543 U.S. at 84 (internal citation omitted); *see Connick*, 461 U.S. at 146 (explaining that "First Amendment protection applies when a public employee arranges to communicate privately with his employer" on a topic of public concern "rather than [] express his views publicly").  Indeed, the Supreme Court in *Rankin* held that the employee's speech was on a matter of public concern even though she had a private conversation that was overheard by someone who was (unbeknownst to her) also in the room.  483 U.S. at 381.

Defendants next argue that Davi's speech was not on a matter of public concern because his comments were "derogatory remarks about the <u>recipients</u> of social services benefits."  ECF No. 93 at 11 (emphasis in original).  This argument may be relevant to whether Defendants could permissibly discipline Davi, but it does not undermine the conclusion that his speech discussed a topic of public concern.  In context, these comments were used to further Davi's argument that welfare benefits should be limited.  "The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."  *Rankin*, 483 U.S. at 387.  Even speech that is "vulgar or misguided" is entitled to First Amendment protection.  *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006); *see also Marquadt v. Carlton*, 971 F.3d 546, 550 (6th Cir. 2020).  Thus, even construing

Davi's remarks as disparaging of welfare recipients, they remain within the First Amendment's ambit.

### III.   The *Pickering* Balancing Test Favors Davi

Under *Pickering*'s second step, "if an employee speaks as a citizen on a matter of public concern, the next question is whether the government had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Lane*, 573 U.S. at 242 (internal quotation omitted).  This analysis "requires 'a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rankin*, 483 U.S. at 384 (quoting *Pickering*, 391 U.S. at 568).  "The weighing of the competing interests is a matter of law for the court." *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011).  At the same time, factual disputes as to whether the government had reasonable grounds to fear disruption from the employee's speech may preclude summary judgment. *Johnson v. Ganim*, 342 F.3d 105, 115 (2d Cir. 2003).

Courts must "assess the extent of the disruption caused by the employee's speech . . . and determine whether the disruption justifies the employer's attempt to stifle the employee's expressive activity." *McEvoy v. Spencer*, 124 F.3d 92, 98 (2d Cir. 1997).   The government's interests "may include such considerations as

maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute." *Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007) (citing *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)). "The employer does not meet its burden" to justify its action, "however, if there is no demonstrated nexus between the employee's speech and the employer's operations." *Id.* Additionally, "some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin*, 483 U.S. at 390.

While they need not prove actual harm, Defendants bear the burden of making a "substantial showing" that Davi's speech was "likely to be disruptive" to prevail at this step. *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995); *see also Locurto*, 447 F.3d at 172. Where, as here, "the employee's speech touches on matters of significant public concern," Defendants must show a correspondingly greater risk of disruption to the government. *Jackler*, 658 F.3d at 237. After considering the government's and employee's interests, the court must balance them, which "is less a matter of calculating and comparing absolute values than it is a *process* that looks at all the circumstances in a given situation and determines which interest weighs more heavily." *Melzer*, 336 F.3d at 197 (emphasis in original).

As I have already observed, Davi's comments are primarily political speech about the proper role of government, which is among the most highly protected speech in our constitutional order. *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011). Moreover, that speech was conducted in Davi's personal capacity (without identifying himself as an administrative law judge) and apparently on his own time, which weighs in his favor. *Connick*, 461 U.S. at 153 n.13. In its investigation, OTDA concluded that Davi harbored no actual bias that affected his job performance. ECF No. 88 ¶ 9; *see also* ECF No. 83-19. To the contrary, he was a well-regarded administrative law judge who overwhelmingly ruled in favor of the applicants for public benefits who appeared before him. ECF No. 83-24 at 13–14.

Defendants have failed to carry their burden to demonstrate that Davi's comments were reasonably likely to disrupt OTDA's operations. OTDA's investigation made clear that Davi's remarks were quite *unlikely* to affect his job as a hearing officer. OTDA's director learned from his contact at Legal Aid that he had not heard of any issues relating to the agency's hearing officers, which suggests either that Legal Aid had not received a copy of the complaint or had not judged it worthy of escalation. ECF No. 88 at ¶ 10. The director did not ask more specifically if Legal Aid viewed any hearing officers as being biased against benefit applicants. *Id.* The director's justification for not being more specific was that he did not want to draw attention to the letter. *Id.* This explanation is hard to comprehend since the

18

letter indicated that a copy was sent to Legal Aid.  Indeed, the Defendants' disruption argument is premised on the assumption that the letter was received and was likely to be weaponized by Legal Aid through motions for recusal or reconsideration.  *See* ECF Nos. 93 at 13–15; 99 at 3.  In any event, nothing prevented the director from asking a somewhat more precise question without drawing attention to the letter.

Moreover, even if the complaint had been brought to the attention of Legal Aid litigators who appeared before Davi, it was implausible that they would seek his recusal.  Precisely because Davi ruled overwhelmingly in favor of benefit applicants—95% of the time—in his five years as a hearing officer, he would have had a sterling reputation among those Legal Aid lawyers practicing before him.  Indeed, as the arbitrator noted, Project Fair of Legal Aid "has space in the location where the hearings are held and [has] access to the people appearing for benefit increases."  ECF No. 83-24 at 10.

Under these circumstances, Legal Aid would be extraordinarily unlikely ever to file a motion for Davi's recusal.  Nor did they.  Defendants respond that OTDA's rules require that any recusal motion be made at the hearing itself, and because Davi was suspended from holding hearings there was no occasion for applicants to seek recusal.  But although Defendants are correct about OTDA's recusal rules, *see* N.Y. Comp. Codes R. & Regs. tit. 18, § 358-5.6(c)(3)(ii), Defendants concede that applicants sometimes request recusal in advance of hearings.  ECF Nos. 83-11 at 30;

83-12 at 21–22.  Because OTDA continued sending hearing notices with Davi listed as the hearing officer during his suspension, the absence of such requests sharply undercuts Defendants' theory that Davi's comments were likely to substantially disrupt OTDA's operations.  Nor was a motion for reconsideration ever filed based on Davi's comments in a case he had previously decided.  Indeed, as Davi argues, it is not apparent that his comments would even have been grounds for recusal or reconsideration under the standard set out by OTDA's governing regulations.  The only grounds for recusal listed there are (1) prior involvement in the substance of the matter which is the subject of the hearing (except in the capacity as hearing officer); (2) financial conflict of interest; or (3) "displayed bias or partiality *to any party to the hearing*."  *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 358-5.6(c)(1).  It is unclear whether a hearing officer's statement on a matter of policy, not directed at any specific "party to the hearing," would entitle a benefit applicant to that hearing officer's recusal.

In sum, although a government employer's "reasonable predictions of disruption" are entitled to "substantial weight," *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion), "to be 'reasonable,' that prediction must be supported with an evidentiary foundation and be more than mere speculation."  *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 944 (7th Cir. 2004); *see also Heil v. Santoro*, 147 F.3d 103, 109–10 (2d Cir. 1998).  Defendants have only pointed to

speculation to attempt to satisfy their burden of proof that Davi's comments would disrupt OTDA's operations.  Davi's interest in commenting on government policies of significant public concern, by contrast, weighs heavily in his favor.  In this context, there was no reason to think that Davi's comments would prompt Legal Aid or other litigants to take action and no evidence that the comments would be further disseminated.  In commenting on this issue of public importance as a private citizen, Davi had "a legitimate interest in maintaining a zone of privacy where he can speak . . . without fear of censure." *Waters v. Chaffin*, 684 F.2d 833, 837 (11th Cir. 1982); *see Pickering*, 391 U.S. at 572 (holding that "it is essential" that public employees "be able to speak out freely" on matters of public concern "without fear of retaliatory dismissal").

None of this is to deny that Davi's remarks are controversial and provided a basis for his initial removal from the hearing calendar pending an investigation into whether his views affected his job performance (as requested by Lloyd).  Rather, I conclude only that Defendants have not met their burden to show that Davi's comments reflected any actual bias that affected his job performance or that the comments were likely to cause disruption in his particular context.  Indeed, Defendants' failure to show any reasonable likelihood of disruption suggests that their justifications were pretextual and that they instead sought to fire Davi because he held disfavored views.  Yet "[i]f there is any fixed star in our constitutional

21

constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Davi is therefore entitled to reinstatement to his position as an administrative law judge. Although Davi may also ultimately be entitled to back pay for the period of his unpaid suspension, I cannot grant such relief against Defendants in their *official* capacities consistent with the doctrine of sovereign immunity. *Dwyer v. Regan*, 777 F.2d 825, 836–37 (2d Cir. 1985); *see also Dotson v. Griesa*, 398 F.3d 156, 178 (2d Cir. 2005). Accordingly, I turn to whether Davi can pursue damages from Defendants in their individual capacities. *See Dwyer*, 777 F.2d at 836–37.

## IV.   **Certain Individual Defendants Are Entitled to Summary Judgment**

State employees may be held individually liable for damages under 42 U.S.C. § 1983 only if they were "personally involved in the alleged deprivation" of Davi's rights. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004). "Personal involvement can be established by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring."

*Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (internal quotation omitted). Davi must also establish that the individuals' actions "were the proximate cause of the plaintiff's constitutional deprivation." *Id.*

Moreover, the individual defendants argue that they are entitled to qualified immunity because "at the time of the challenged conduct there was no clearly established law that such conduct constituted a constitutional violation." *Lynch*, 811 F.3d at 578 (internal quotation omitted). But although qualified immunity may foreclose liability based on a novel application of the *Pickering* balancing test, *see id.* at 583, the Second Circuit has held that qualified immunity does not apply when there is evidence that defendants' actual motive was to retaliate against the employee's speech rather than due to a concern about disruption. *Locurto v. Safir*, 264 F.3d 154, 167 (2d Cir. 2001). That is because "applying an objective test to a subjective element is a contradiction in terms," and thus qualified immunity is unavailable to the extent Davi shows "particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive." *Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir. 1996); *see Locurto*, 264 F.3d at 167. Indeed, Davi does not argue that the application of the *Pickering* balancing test was clearly established in this context, but rather relies solely on the evidence that the individual defendants acted with retaliatory intent. ECF No. 94 at 26.

Before proceeding to the individual defendants, one general point must be

made.  The defendants properly argue that they can only be held liable for their individual actions, and they note that they played differing roles in the various measures taken against Davi.  Nevertheless, Davi asserts only a single claim in this litigation—that Defendants retaliated against him in violation of the First Amendment—and to the extent any of the individual defendants are liable under the demanding standard described above, they are not entitled to summary judgment.

### A.  *Samuel Spitzberg*

Samuel Spitzberg, OTDA's director, had perhaps the greatest personal involvement of the defendants in disciplining Davi and the most knowledge from which a jury could conclude he acted with retaliatory intent.  By his admission, Spitzberg participated in the November 5 decision to suspend Davi and removed him from the hearing calendar.  ECF No. 88 at ¶¶ 5, 8.  Spitzberg then reviewed Davi's decisions "and found no evidence of actual bias therein."  *Id.* ¶ 9; *see also* ECF No. 83-19.  Moreover, Spitzberg reached out to a contact at Legal Aid who said he had not heard of any "scuttlebutt" regarding OTDA's hearing officers.  ECF No. 88 at ¶ 10.  After Davi rejected OTDA's settlement offers, Spitzberg nonetheless "concluded that there was no alternative but to seek to terminate Plaintiff's employment."  *Id.* ¶ 12.  He therefore signed Davi's notice of discipline.  *Id.* ¶ 13.

A jury could reasonably conclude that Spitzberg took this adverse action against Davi despite knowing there was no evidence that Davi acted with actual bias

and that Legal Aid had either not received Davi's comments or had not found them worthy of escalation.  Moreover, Spitzberg authorized a notice of discipline charging Davi with actual bias despite knowing otherwise.  These actions more than suffice to demonstrate Spitzberg's personal involvement in decisions that, construed in the light most favorable to Davi, violated his constitutional right not to be retaliated against for the content of his speech.

### B.   *Eric Schwenzfeier*

Eric Schwenzfeier, the assistant deputy commissioner for OTDA's Division of Administrative Services at the relevant time period, participated in the November 5 meeting with other senior officials at OTDA shortly after receiving the anonymous complaint.  ECF No. 89 at ¶ 4.  He asserts that, at that meeting, a "collective decision was made to remove Plaintiff from his duty of holding hearings pending further investigation."  *Id.* Moreover, he testified that, at that meeting, they decided that Davi could no longer be a hearing officer and that he should be suspended without pay.  ECF No. 83-8 at 62, 64.  Although Davi was initially only removed from the hearing calendar, Schwenzfeier testified that this first step was essentially only for show and that the decision had already been made to suspend Davi.  The only reason they waited a week to effectuate that decision was because "[g]eneral office practice is to afford an opportunity to [the] employee to be interviewed."  *Id.* at 62. Schwenzfeier also testified that, in his view, Davi's statements reflected actual bias,

25

and he notably agreed that OTDA would have been justified in taking action against anyone who held Davi's views even if they had not been voiced.  *Id.* at 72.

Schwenzfeier's decision to remove Davi from the hearing calendar pending an investigation was reasonable and did not violate clearly established law. Nonetheless, a jury could find that he acted with retaliatory intent by deciding to suspend Davi without regard to the result of any investigation, even though Schwenzfeier had no known involvement in the decision to terminate Davi. Moreover, Schwenzfeier's testimony that he would have taken action against Davi simply because of his views could reasonably be understood to mean that Schwenzfeier did not care whether those views affected Davi's job performance or would cause disruption.  Schwenzfeier is therefore not entitled to summary judgment on qualified immunity in light of the evidence from which a jury could conclude that he retaliated against Davi because Davi held disfavored views rather than due to the risk of disruption.  *Sheppard*, 94 F.3d at 828.

### C.   *Sharon Devine*

Sharon Devine, then OTDA's executive deputy commissioner, played a direct role in two decisions: she approved the decision to suspend Davi in early November 2015 and approved the notice of discipline in late December.  *See* ECF Nos. 88 at ¶ 5; 90-2 at 47.  Although there is less direct evidence of Devine possessing an unconstitutionally retaliatory motive, it is nonetheless sufficient to deny her motion

for summary judgment.  General counsel Krista Rock testified that Devine made the decision to issue the notice of discipline and seek Davi's termination in consultation with Samuel Spitzberg.  ECF No. 90-4 at 56.  As discussed elsewhere, however, Spitzberg was intimately involved in investigating Davi, had concluded that Davi's decisions did not reflect actual bias, and had contacted Legal Aid and learned that his contact was unaware of any "scuttlebutt" about OTDA's hearing officers.  Indeed, Spitzberg testified that he "would not have issued the [notice of discipline] without Sharon Devine's approval."  ECF No. 90-5 at 90.   Yet the notice of discipline that Devine authorized charged Davi with actual bias and sought his termination.  Thus, a jury could reasonably conclude that, at the time Devine approved the notice of discipline, she did so for pretextual reasons despite having learned that Davi had no actual bias and that his comments were unlikely to generate disruption.

## D.  *Donna Faresta*

Donna Faresta, the former head of OTDA's human resources department, is entitled to summary judgment because Davi points to no "particularized evidence of direct or circumstantial facts supporting his claim of unconstitutional motive." *Sheppard*, 94 F.3d at 828.  Davi points to two acts she took: first, Faresta signed a letter apprising Davi that, after his interview on November 13, 2015, he was suspended without pay.  ECF No. 83-1 at 11–12.  Second, after Davi's six-month unpaid suspension, she sent him a letter confirming his transfer to the role of senior

27

attorney, as permitted by the arbitrator.  *Id.* at 67.

Davi points to no particularized evidence, however, that she took either action based on a retaliatory motive.  At most, Davi and Schwenzfeier testified that Faresta was generally involved in the decision to suspend Davi and to transfer him to the role of senior attorney, and defendants have admitted the same.  *See, e.g.*, ECF Nos. 90-1 at 83; 90-6 at 139–42; 83-2 at 16.  By contrast to Devine, however, Davi has pointed to no evidence that Faresta personally had reason to know that the decisions she implemented were based on anything other than neutral concerns about disruption.  Accordingly, since Davi has failed to satisfy his burden, Faresta is entitled to summary judgment.

## E.  *Krista Rock*

Krista Rock, the general counsel of OTDA, is likewise entitled to summary judgment.  Davi seeks to hold Rock liable because she participated in the November 5 meeting in which Defendants decided to remove Davi from the hearing calendar, and for the role she allegedly played in rejecting his 2016 application to serve as a supervising hearing officer.  ECF Nos. 90-1 at 93; 90-4 at 30–33.  As Rock testified—and as Davi has not disputed—she only had the ability to discipline individuals working in the general counsel's office, but had no authority to discipline or make hiring decisions related to Davi.  ECF No. 90-4 at 37.  At most, she arranged to implement the decisions others had made.  *See* ECF No. 96-12 at 70–71.  Because

the evidence indicates that Rock provided legal advice and did not have authority over Davi, she lacked sufficient "personal involvement" in the deprivation of Davi's rights, was not the proximate cause of that deprivation, and is entitled to summary judgment. *See Zehner v. Jordan-Elbridge Bd. of Educ.*, 2019 WL 4083040, at *9 (N.D.N.Y. Aug. 29, 2019) (collecting cases).

## F.   *Samuel Roberts*

Finally, Samuel Roberts, who led OTDA as its commissioner, is entitled to summary judgment. Davi points to no evidence of Roberts' personal involvement other than that he was copied on the original letter Lloyd wrote and that Davi sent Roberts a letter challenging OTDA's treatment of him. *See* ECF Nos. 83-1 at 3; 96-11. Roberts submitted a declaration in which he denied having any "role or involvement in any employment decision" related to Davi, and said that he did not view the anonymous complaint or Davi's letter. ECF No. 85 at ¶ 4. The other defendants agree that Roberts was uninvolved. *See, e.g.*, ECF Nos. 90-3 at 151; 90-4 at 101, 105; 90-5 at 151.

The Second Circuit has held that the mere receipt of letters is insufficient to demonstrate personal involvement under § 1983. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *accord Allah v. Annucci*, 2018 WL 4571679, at *6 (S.D.N.Y. Sept. 24, 2018) (collecting cases). Davi argues, however, that he should be entitled to reopen discovery under Fed. R. Civ. P. 56(d) to determine if Roberts played a greater

role because he was not given the opportunity to depose Roberts. But Judge Mauskopf denied him that opportunity because "[h]igh-ranking government officials, such as Commissioner Roberts, should not be subject to deposition unless a plaintiff can show that they possess unique personal knowledge, not obtainable through other, less burdensome, means of discovery." *Davi v. Roberts*, 2018 WL 4636805, at *2 (E.D.N.Y. Sept. 26, 2018). Davi has still not made that showing, and Roberts' motion for summary judgment is granted.

## V.   <u>Official Capacity Defendants</u>

Because Roberts and Faresta have left OTDA's employment, their successors are automatically substituted for the claims asserted against them in their official capacity. Fed. R. Civ. P. 25(d). Although Defendants argue that all official capacity claims other than the one against Roberts' successor should be dismissed as duplicative, I see no practical reason to do so. To the extent those officials have a role in the equitable relief to which Davi is entitled, the claims against them in their official capacity can remain.

## <u>CONCLUSION</u>

Davi's motion for partial summary judgment is granted. Defendants' motions for summary judgment are denied, except that the claims against Faresta, Rock and Roberts in their individual capacities are dismissed. The parties are directed to confer on a proposed order reinstating Davi as an administrative law judge and

should submit it within seven days.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York                              Edward R. Korman
March 3, 2021                                        United States District Judge