UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SALVATORE DAVI,

                    Plaintiff,

        – against –

BARBARA C. GUINN, Acting
Commissioner, New York State Office of
Temporary and Disability Assistance in her
official capacity, *et al.*,

                    Defendants.

**MEMORANDUM & ORDER**

16-cv-5060 (ERK) (PK)

KORMAN, *J.*:

        This case returns to me upon remand from the Second Circuit.  My prior

decision granted Plaintiff's motion for partial summary judgment and denied in part

and granted in part Defendants' motion for summary judgment.  Upon remand, both

parties filed supplemental submissions on their respective motions.  The background

and facts of this case are set forth in the prior decision.  *See Davi v. Roberts*, 523 F.

Supp. 3d 295 (E.D.N.Y. 2021).  Nevertheless, I summarize the relevant aspects of

the case below, borrowing from the prior decision as appropriate.

## BACKGROUND

        Beginning in 2010, Plaintiff Salvatore Davi was a hearing officer at the New

York State Office of Temporary and Disability Assistance ("OTDA").   OTDA

defines its mission as enhancing the economic security of low-income New Yorkers,

1

including through the provision of public benefits, "with a focus on employment wherever possible."  ECF No. 82 ¶ 5.[1]  As a hearing officer—what OTDA also calls an administrative law judge—Davi reviewed the denial or reduction of welfare benefits by social service districts that make initial decisions on applicants' eligibility for benefits, including food stamps, disability benefits, and other forms of supplemental income.  ECF No. 92 ¶¶ 16, 18; *see also* N.Y. Comp. Codes R. & Regs. tit. 18, §§ 358-2.9, 358-3.1, 358-5.6 (2021).

While the hearing officers' responsibility could encompass more, the hearings Davi held were generally limited to such matters as whether applicants who had been denied benefits had submitted documents requested by an agency; whether they appeared at appointments to discuss their eligibility for benefits; and whether the applicants satisfied income and eligibility thresholds.  ECF Nos. 92 ¶ 23; 82 ¶ 19; 83-11 at 25–27; *see also Lisnitzer v. Zucker*, 983 F.3d 578, 581 (2d Cir. 2020).  The rulings Davi issued were recommendations subject to review by a supervisor.  *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 358-5.6(b)(9).

On October 28, 2015, Davi responded to an article that had been posted on the personal Facebook page of someone he knew.  The article was from the website *Daily Kos* and entitled "Anti-poverty programs like food stamps are working.  Let's

---

[1] Filings are cited by paragraph numbers or internal pagination where possible. Otherwise, filings are cited by the pagination generated by the Court's electronic filing system.

expand them, not make more cuts."[2]  Davi and a law school classmate, Erin Lloyd,

then had an argument in the comments of the Facebook post.  Both the Facebook

post and the argument appear not to have been accessible to the general public.  ECF

No. 83-8 at 105–07.  Because the context is significant, I reproduce the relevant

portion of their conversation verbatim (without correcting spelling or grammar):

> **DAVI**: This article and the underlying study use the wrong metric.
> These programs should be judge by how many people or families they
> get back on their feet and off government assistance, not how well these
> programs enable their recipients to be poor and collect government
> assistance for the rest of their lies.
>
> **LLOYD**: "enable their recipients to be poor" – RIGHT! of course!
> people who need $150/mo to get their basic food needs met are just
> being ENABLED!  The goal of any public assistance program should
> be to AID the poor.  It's the job of politicians and employers to… [*See
> More*][3]
>
> **DAVI**: Says who?  Where does it say ANY of that in the Constitution?
> It is not the government's job to subsidize laziness and failure.  I agree
> that there should most certainly be a safety net, but it should be of
> limited duration and designed to get people back to self-sufficiency.
> But I have zero sympathy for anyone who refuses to work and/or get
> the education or training to earn a living wage.
>
> This country has turned welfare into a generational career path!

ECF No. 83-1 at 4.  At this point, the conversation turned personal and nasty.  Lloyd

told Davi, "I remember your bullshit from law school, so I've got no patience for

---

[2]  *See*  https://www.dailykos.com/stories/2015/10/27/1440684/-Anti-poverty-programs-like-food-stamps-are-working-Let-s-expand-them-not-make-more-cuts.

[3]  This comment is abridged in the copy sent with the anonymous complaint to Davi's employer.  The full comment is available elsewhere in the record and is not necessary to follow the conversation.  *See* ECF No. 90-22 at 3.

you.  Who brought up the constitution?  Not me.  I didn't say a word about the law. I'm talking MORALS, my friend." *Id.*  Davi responded: "If you are going to be that nasty then fuck you, too.  Your 'morals' suck because they create an underclass dependent on government handouts that translates into generational poverty, while at the same time taxing productive members of our society to the breaking point." *Id.*

On November 4, 2015, OTDA received an anonymous complaint, with a copy of the discussion enclosed, from someone claiming to have observed the discussion on a mutual friend's Facebook page.  *Id.* at 3.  The complainant—who claimed not personally to know Davi but who was later revealed to be Lloyd herself—stated that Davi's comments "are wholly unethical and expose a severe bias against many of the individuals who may be coming before him" as an administrative law judge.  *Id.* She urged OTDA "to conduct an investigation," including into "whether past rulings reflect bias against benefit recipients."  *Id.*  The letter indicated that a copy was being sent to Project FAIR of the Legal Aid Society, which provides pro bono representation to benefit applicants appearing before OTDA's administrative law judges.  *Id.*  As Defendants note, "[a]nyone who passes through the lobby of the building on their way to a Fair Hearing has an opportunity to meet with Project FAIR staff to ask questions or request representation."  ECF No. 93 at 4.

On November 5, OTDA officials took several steps in response to the

4

anonymous letter.  One OTDA official, Kristi Berner, explained on an email chain with several other officials:

> I did some research and the [Facebook] posting seems to be legit.  Daily Kos does have that article on their website, which some mutual friend of Dali [sic] and Erin Lloyd must have shared on [Facebook].  The [Facebook] photos on the letter are currently the photos on Dali's [sic] and Lloyd's accounts.  Lloyd mentions she knows Dali [sic] from law school and both list CUNY law school on their bios/resumes.

ECF No. 90-19 at 3.  OTDA's senior staff also held a meeting to discuss the complaint and agreed to remove Davi from the hearing calendar pending the outcome of their investigation.  OTDA's assistant deputy commissioner Eric Schwenzfeier, who participated in that meeting, testified that the participants decided on that day to suspend Davi without pay, but that they waited one week to do so because "[g]eneral office practice is to afford an opportunity to [the] employee to be interviewed."  ECF No. 83-8 at 62; *see also* ECF Nos. 89 ¶ 4; 86 ¶¶ 5, 7 (explaining that OTDA "planned to issue the Notice of Suspension at the conclusion of the interrogation unless [Davi] provided some exculpatory information during the interrogation").

That same day, OTDA's director, Samuel Spitzberg, listened to recordings of ten of Davi's hearings and wrote in an email that he found Davi "polite in every case" and that he "was fair and provided clients with good advice and explanations." ECF No. 83-19; *see* ECF No. 88 ¶ 9.  On November 10, Spitzberg provided an update that he had found nothing to contradict that initial assessment.  ECF No. 83-19.

Indeed, the investigation revealed that, by one rough calculation, Davi recommended awarding public benefits to applicants in approximately 95% of the hundreds of cases he reviewed each month.  *See* ECF Nos. 83-24 at 11, 14; 131-1 ¶¶ 2–6.

Around that same time, Spitzberg called an acquaintance at Legal Aid and asked if he had heard any "scuttlebutt" about hearing officers, presumably to determine if Legal Aid had received the complaint and, if so, how it intended to respond.  His Legal Aid contact replied that he had not heard anything.  ECF No. 88 ¶ 10.

On November 9, OTDA issued a notice of interrogation to Davi, alerting him that he would be interviewed.  *See* ECF Nos. 82 ¶ 40; 83-1 at 6.  On November 13, OTDA interviewed Davi and, at the end of the interview, suspended him without pay pending a formal notice of discipline, effective immediately.  *See* ECF Nos. 83-1 at 11; 142-1.  On November 18, OTDA contacted Lloyd, who confirmed that she had sent the complaint and said that she had also sent a copy to Legal Aid.  *See* ECF Nos. 90-21 to -23; 90-6 at 60, 82.

During this time, no benefit applicant sought Davi's recusal based on his remarks, even though OTDA sent out hearing notices for mid-November and early December 2015 that indicated Davi would be the hearing officer.  Nor did any applicant seek reconsideration of any adverse rulings in the months after Legal Aid was sent Davi's comments.  ECF Nos. 92 ¶¶ 45, 77; 83-18; 83-11 at 52–53.

Having determined that Davi was unbiased, OTDA nevertheless sent Davi a notice of discipline on December 29 proposing to terminate his employment on the ground that the comments created an appearance of bias and reflected actual bias. *See* ECF No. 83-1 at 33–38.

Davi's union challenged the discipline in binding arbitration. In a decision issued on April 28, 2016, the arbitrator dismissed the agency's claims that Davi was biased, finding "[t]here was no evidence offered that [Davi] was biased in conducting hearings assigned to him nor did he have any involvement in any [action] before him." ECF No. 83-24 at 7, 13. He further concluded that:

> [Davi] has been employed as a hearing officer since March 2010, and his decisions reveal no bias. All of his previous supervisors who had the responsibility of signing his recommendations testified that they never detected any bias in his recommendations. The record shows that he has ruled in favor of the clients 95% of the time, thus providing empirical data of his ability to make an unbiased recommendation on all proceeding in his jurisdiction.
>
> Not only did his supervisors speak to his unbiased approach to his job but also to his value as an employee. They praised his work ethics, his sense of responsibility, his intelligence, his demeanor and clearly felt he was an overall asset to the office.

*Id.* at 14.

The arbitrator nonetheless upheld the charge that Davi's comments created an appearance of bias because Legal Aid was now "armed with information that would severely discredit the premise of impartiality of [Davi] and by extension, that of the agency." *Id.* at 13. The arbitrator concluded that it was "not believable" to assume

7

that Legal Aid "would not use the public words of [Davi] in an effort to either not allow [Davi] to decide the fate of their clients or to appeal an adverse recommendation," crediting OTDA's purported concern that his comments would cause disruption.  *Id.*  He determined that Davi's conduct warranted discipline but concluded that the proper punishment was six months' suspension followed by a transfer to another position at the same pay grade (which "need not include the duties of a hearing officer"), rejecting OTDA's attempt to terminate Davi's employment. *Id.* at 14–15.  The arbitrator did not explain how suspending Davi for six months without pay would address the agency's concern that his Facebook comments would disrupt its operations.

Davi sought to vacate the arbitration award in an Article 75 proceeding, which was denied on the ground that he lacked standing because he was not a party to the arbitration.  Following his suspension, Davi was transferred to the role of senior attorney at OTDA, where his responsibilities include litigation, keeping abreast of developments affecting hearing officers, and reviewing requests for recusal of hearing officers.  ECF No. 92 ¶¶ 101–03, 112.  Both during and after his suspension, Davi applied for jobs at OTDA as a supervising hearing officer or hearing officer, which he did not receive.  ECF No. 82 ¶ 77.

After his challenge to the arbitrator's decision in state court was rejected, Davi filed this lawsuit, alleging that this discipline constituted unlawful retaliation in

violation of the First Amendment.  Defendants are various agency employees sued in their official and individual capacities.  Davi filed a motion for partial summary judgment, and Defendants filed a cross motion for summary judgment.  On March 3, 2021, I issued a Memorandum & Order granting Davi's motion for partial summary judgment and denying Defendants' motions for summary judgment, except that the claims against three defendants—Donna Faresta, Krista Rock, and Samuel D. Roberts—in their individual capacities were dismissed.  I also imposed a permanent injunction, requiring that Defendants reinstate Davi to his position as a hearing officer, subject to the parties' stipulation that Defendants were not required to assign Davi to conduct hearings.  *See* ECF Nos. 109; 115; 119; *see also Davi v. Roberts*, No. 16-cv-5060, 2021 WL 2184873 (E.D.N.Y. May 28, 2021) (granting in part and denying in part Davi's motion for reconsideration and enjoining Defendants to remove references to the suspension from Davi's personnel file).  Defendants appealed to the Second Circuit, which vacated the order and the injunction and remanded for further proceedings.  *See Davi v. Hein*, No. 21-7190-cv, 2023 WL 2623205 (2d Cir. Mar. 24, 2023) (summary order).

As before, the issue presented by Davi's complaint and his motion for partial summary judgment is whether OTDA and its supervising officials unlawfully retaliated against him.  He seeks equitable relief to reinstate him to his former position.  Defendants seek summary judgment on the theory that their actions were

constitutional and, in the alternative, that the individual defendants are entitled to qualified immunity.

## STANDARD OF REVIEW

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim. *Id.* at 325. Once the movant meets its initial burden, the non-moving party may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See Anderson*, 477 U.S. at 250.

## DISCUSSION

## I.   First Amendment Claim

Where a public employee claims that he was retaliated against in violation of the First Amendment, he must demonstrate: (1) that his speech was protected by the First Amendment; (2) that the defendant took adverse action against him; and

(3) that there was a causal connection between the adverse action and the protected speech. *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018).  Only the first element is at issue here—Defendants do not dispute on summary judgment that they took adverse action against Davi, nor that there was a causal connection between Davi's speech and the adverse action taken against him.  ECF No. 93 at 8.

In determining whether certain speech is protected, the Supreme Court has long recognized that government employees do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  "At the same time, however, 'the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Lynch v. Ackley*, 811 F.3d 569, 577 (2d Cir. 2016) (quoting *Pickering*, 391 U.S. at 568).  Thus, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

To balance these interests, courts apply the *Pickering* test, a "two-step inquiry into whether a public employee's speech is entitled to protection." *Lane v. Franks*, 573 U.S. 228, 237 (2014).  At the first step, the employee must have spoken "as a

citizen on a matter of public concern," rather than pursuant to his official duties or based on a personal grievance related to his employment. *Id.* (internal quotation marks omitted) (quoting *Garcetti*, 547 U.S. at 418). If he has, then the question is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. If so, the employee may nonetheless prevail if he shows that the government retaliated against him for the content of his speech rather than because of the justifications it has offered. *Melzer v. Bd. of Educ.*, 336 F.3d 185, 193 (2d Cir. 2003).

My prior decision on the motions for summary judgment held that Davi spoke as a citizen on a matter of public concern. *See Davi v. Roberts*, 523 F. Supp. 3d at 306–08. The parties do not challenge that determination here. Thus, the only issue here is whether OTDA had an adequate justification for its treatment of Davi.

### A. Deference to Arbitrator's Decision

As an initial matter, the parties dispute how much deference to accord the arbitrator's decision, including the determinations about the reasonableness of OTDA's decisions. In a case involving a Title VII claim, the Supreme Court explained that an "arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974); *see also id.* at 60 n.21 (declining to adopt "standards as to the weight

to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case").  The Court set forth several factors to consider in determining how much weight to give an arbitration decision, namely: "the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators."  *Id.*  While *Alexander* involved a Title VII claim, there is nothing in the decision to suggest that the same principles should not apply to a constitutional claim.

The Second Circuit's decision in *Collins v. New York City Transit Authority*, 305 F.3d 113 (2d Cir. 2002), provides a helpful application of *Alexander*.  There, the court concluded that "a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator . . . is highly probative of the absence of discriminatory intent in [the plaintiff's] termination."  *Collins*, 305 F.3d at 119.

Here, despite some parallels, the arbitration decision is entitled to less probative weight than that in *Collins*.  As in *Collins*, there is no suggestion that the arbitrator was not neutral, unbiased, and independent; and the existence of a negative arbitration decision suggests that there were legitimate reasons for OTDA's adverse employment actions against Davi.

Nevertheless, the other factors provided in *Alexander* do not weigh in favor of according the arbitration decision significant probative weight.  Namely, the arbitrator himself ruled that Davi's First Amendment rights and any alleged violation thereof were outside the scope of the collective bargaining agreement and the arbitration.  *See* ECF No. 92 ¶ 91.  It is not clear whether the record before the arbitrator even discussed retaliation: The arbitration decision notes that the issues focused on whether there was just cause to discipline Davi, and if so, what the appropriate penalty was, but it does not provide greater detail on what was discussed in the hearings.  *See* ECF No. 83-24 at 2, 10.  Nor is there any indication that this arbitrator possessed some "special competence" concerning First Amendment matters.  Thus, although the arbitration decision was a neutral, unbiased, and independent judgment, the other factors weigh in favor of giving the arbitration decision little weight in the instant First Amendment analysis.

**B. Deference to OTDA's Predictions of Disruption**

The parties next dispute whether deference is owed to OTDA's predictions of disruption.  "[D]eference to the government's assessment of potential harms to its operations is appropriate when the employer has conducted an objectively reasonable inquiry into the facts . . . and has arrived at a good faith conclusion as to those facts."  *Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007).  The Supreme Court has explained that

14

> [i]t may be unreasonable, for example, for the employer to come to a conclusion based on no evidence at all.  Likewise, it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available—if, for instance, an employee is accused of writing an improper letter to the editor, and instead of just reading the letter, the employer decides what it said based on unreliable hearsay.

*Waters v. Churchill*, 511 U.S. 661, 677 (1994).  In *Waters*, the Supreme Court concluded that the government employer had conducted a reasonable investigation where the decisionmaker "had the word of two trusted employees, the endorsement of those employees' reliability by three hospital managers, and the benefit of a face-to-face meeting with the employee he fired."  *Id.* at 680.

The Second Circuit's decision in *Piscottano v. Murphy* also illustrates features of a reasonable investigation.  There, the plaintiffs sued their employer, a correctional facility, alleging that discipline imposed upon them for their association with the local chapter of the Outlaws Motorcycle Club violated, *inter alia*, their First Amendment right to freedom of expressive association.  *Piscottano*, 511 F.3d at 252–53.  The Second Circuit disagreed, concluding that the defendants had conducted reasonable investigations and arrived at a good-faith conclusion that the plaintiffs' activities would be disruptive to the defendants' operations.  *Id.* at 276–77.  As part of the investigation, the defendants: received federal reports of unlawful activity by other chapters of the Outlaws Motorcycle Club; received information from state and local police about the plaintiffs' membership in the local chapter and their activities;

15

received an anonymous letter stating that the plaintiffs were members of the local chapter; conducted interviews with the plaintiffs about their alleged membership; and initiated individual proceedings against each plaintiff, with notice and opportunity for a hearing, before ultimately taking disciplinary action against them. *Id.* at 253–65.

Here, OTDA's investigation falls short of those that the Supreme Court and the Second Circuit have determined to be reasonable and thereby does not merit deference. For one thing, OTDA's investigation was decentralized and inconclusive. Whereas in *Waters*, the reasonable investigation was characterized by a single decisionmaker speaking with all employees involved, here, various parts of the investigation were undertaken by different individuals. Notably, the final decisionmaker—Spitzberg—did not have the "benefit of a face-to-face meeting with the employee [against whom he took disciplinary action]." *See Waters*, 511 U.S. at 680; ECF No. 88 ¶¶ 11–13. While a face-to-face meeting is not required, the failure to have such a meeting is significant here because, prior to his suspension, Davi never confirmed that he had made the Facebook comments. To the contrary, during the interrogation, Davi stated that he could not recall whether he had read the *Daily Kos* article or made the comments. *See* ECF No. 142-1 at 14:16–27:24. Nor did OTDA get in touch with Erin Lloyd, who sent the anonymous letter, until November 18—after Davi's suspension. Thus, OTDA believed that Davi had made the

16

Facebook comments—and suspended him accordingly—based only on Kristi Berner's rudimentary authentication.

Additionally, in contrast to the notice and hearings afforded to the plaintiffs in *Piscottano*, here, Davi received notice of his interrogation on November 9, for an interrogation scheduled only four days later. Aside from the notice's reference to "allegations that you made public comments that disparage the population that is served by [OTDA]," Davi did not receive any information about the subject matter of the interrogation until during the interrogation. ECF Nos. 82 ¶¶ 41–43; 83-1 at 8. Even at the interrogation, Davi was not given a copy of the anonymous letter or the excerpts from Facebook. ECF No. 82 ¶ 46; *see also* ECF No. 142-1 at 19:18–21:21. Moreover, the defendants' testimony and declarations indicate that the decision to suspend Davi was made at a meeting on November 5, 2015, before his interrogation even took place. Aside from contacting Erin Lloyd, no further "investigation" took place following Davi's suspension. Thus, the record reflects that, far from conducting a reasonable investigation, OTDA made no effort to afford Davi fair procedures and had predetermined his suspension. Accordingly, in the absence of a reasonable investigation, I need not defer to OTDA's assessment that the suspension and discipline were reasonable.

## C. *Pickering* Balancing

Having concluded that no deference is due either to the arbitrator's decision or OTDA's predictions of disruption, I turn to the application of the *Pickering* balancing test. Under this test, "the government can prevail if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities, and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech." *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998) (citations omitted). "Evidence that . . . harms or disruptions have in fact occurred is not necessary. The employer need only make a reasonable determination that the employee's speech creates the potential for such harms." *Piscottano*, 511 F.3d at 271.

Three considerations inform the balancing of the potential disruption against the First Amendment value of the speech. First, courts "take into account the 'manner, time, and place' in which speech or activity occurred, keeping in mind that the government is more likely to meet its burden when an employee's disruptive activity occurs in the workplace than when the equivalent activity occurs on an employee's own time, away from work." *Melzer*, 336 F.3d at 197 (citations omitted). Second, courts must consider the content of the speech. "The more speech touches on matters of public concern, the greater the level of disruption the government must show." *Id.* Finally, courts must consider the nature of the employee's

18

responsibilities.  "The level of protection afforded to an employee's activities will vary with the amount of authority and public accountability the employee's position entails.  A position requiring confidentiality, policymaking, or public contact lessens the public employer's burden in firing an employee for expression that offends the employer."  *Id.*; *see also Rankin v. McPherson*, 483 U.S. 378, 390 (1987) ("[S]ome attention must be paid to the responsibilities of the employee within the agency[,] [and] [t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.").  Ultimately, "[t]he balancing test is less a matter of calculating and comparing absolute values than it is a *process* that looks at all the circumstances in a given situation and determines which interest weighs more heavily."  *Melzer*, 336 F.3d at 197.[4]

Even with greater consideration of the risk of disruption, Defendants have failed to carry their burden to demonstrate that Davi's comments were reasonably likely to disrupt OTDA operations.  OTDA explains that it was concerned about damage to its reputation and an increase in recusal requests, should the comments

---

[4] The Second Circuit instructed that on remand, greater consideration should be given to the risk of disruption and OTDA's assessment of the risk of potential disruption resulting from Davi's Facebook comments, and Davi's "public-facing" role as a hearing officer.  *See Davi*, 2023 WL 2623205, at *4.

be made public, presumably by Legal Aid.  But as explained in my previous decision, it was never confirmed that Legal Aid received the letter:

> OTDA's director learned from his contact at Legal Aid that he had not heard of any issues relating to the agency's hearing officers, which suggests either that Legal Aid had not received a copy of the complaint or had not judged it worthy of escalation.  The director did not ask more specifically if Legal Aid viewed any hearing officers as being biased against benefit applicants.  The director's justification for not being more specific was that he did not want to draw attention to the letter. This explanation is hard to comprehend since the letter indicated that a copy was sent to Legal Aid.  Indeed, the Defendants' disruption argument is premised on the assumption that the letter was received and was likely to be weaponized by Legal Aid through motions for recusal or reconsideration.  In any event, nothing prevented the director from asking a somewhat more precise question without drawing attention to the letter.

*Davi*, 523 F. Supp. 3d at 309.  Thus, given the uncertainty, it was unreasonable for OTDA to assume that Legal Aid had actually received the letter.

Moreover, it was not reasonable for OTDA to assume that Legal Aid might act on the letter in a way that would cause disruption for the agency.  The deposition from an entity representative for Legal Aid indicates as much.  *See* ECF No. 136-5. Speaking in a personal capacity, Esperanza Colon explained that the Facebook comments "seem[ed] serious," but without knowing "who [the letter] comes from or [whether there was] any truth behind any of it," she could not say with certainty what impact the letter would have had.  *Id.* at 95:04, 96:03–05; *see also id.* at 100:07–10, 14–16.  Colon stated that, had she been a staff attorney who received the letter, she would have alerted her superior to it; and had she been a manager, she would have

flagged the letter "to see if there was something we had to do about [it]." *Id.* at 94:21–25, 92:18–23.   Upon further questioning, she added that if the Facebook comments had been made by a hearing officer during a hearing, the course of action—if any—would likely depend on whether the hearing officer had issued a favorable decision to the client. *Id.* at 104:16–25.  That is, if the hearing officer gave a fully favorable decision to their client, "it might not be something [they] would address at all."  *Id.*  at 104:21–25.   And given that Davi, by one measure, recommended awarding benefits in 95% of cases, *see* ECF No. 131-1  ¶¶ 2–6, disruption caused by Legal Aid seems particularly unlikely.

Moreover, it is not apparent that there even would have been grounds for Davi's recusal.  *See Davi*, 523 F. Supp. 3d at 310 ("The only grounds for recusal listed [in OTDA's governing regulations] are (1) prior involvement in the substance of the matter which is the subject of the hearing (except in the capacity as hearing officer); (2) financial conflict of interest; or (3) 'displayed bias or partiality *to any party to the hearing*.'  It is unclear whether a hearing officer's statement on a matter of policy, not directed at any specific 'party to the hearing,' would entitle a benefit applicant to that hearing officer's recusal." (citing N.Y. Comp. Codes R. & Regs. tit. 18, § 358-5.6(c)(1) (2021))).

Thus, the Legal Aid testimony and the record underscore that the letter—had it been received by Legal Aid—would likely have prompted some action internally,

but there were many factors that would have influenced Legal Aid's course of action from there.   In other words, there was no guarantee that it would lead to any publicization or recusal requests, and the potential for disruption to OTDA—while not nonexistent—was slim.

This slim possibility of disruption is outweighed by Davi's First Amendment interest.  First, the "manner, time, and place" of Davi's speech favors him: There is no indication that Davi made the comments during work, and the comments were posted on a private Facebook thread that only Facebook friends of the original poster could see.  Second, Davi's protected speech touched squarely on matters of public concern.   In the Facebook exchange, he critiqued the *Daily Kos* article's methodology and opined on what the goal of public assistance programs should be. Although the conversation became unsavory, Davi's comments nevertheless offered his views on matters of public concern—welfare programs, their mission, their metrics for success, and their impact on society.  Such comments lie at the heart of First Amendment protection.  *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011); *see also Bond v. Floyd*, 385 U.S. 116, 136 (1966) ("Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected.").  Moreover, the close nexus between Davi's line of work and the topic of his protected speech heightens the government's burden.  *See Waters*, 511 U.S. at

22

674 ("Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions.  And a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters.  In many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." (citation omitted)).

Only the third consideration—the nature of the employee's responsibilities—weighs in OTDA's favor, but even then, the degree to which it reduces OTDA's burden is slight.  As a hearing officer, Davi's role required him to, *inter alia*,

> preside over the fair hearing and regulate the conduct and course of the fair hearing, including at the hearing officer's discretion, requiring sworn testimony, and administering the necessary oaths; . . . elicit documents and testimony, including questioning the parties and witnesses, if necessary, particularly where the appellant demonstrates difficulty or inability to question a witness; . . . review and evaluate the evidence, rule on the admissibility of evidence, determine the credibility of witnesses, [and] make findings of fact relevant to the issues of the hearing which will be binding upon the commissioner unless such person has read a complete transcript of the hearing or has listened to the electronic recording of the fair hearing . . . .

N.Y. Comp. Codes R. & Regs. tit. 18, § 358-5.6(b) (2021); *see also* ECF No. 83-15. In practice, Davi's role and responsibilities were somewhat more constrained.  His hearings were generally limited to such matters as whether applicants who had been denied benefits had submitted requested documents, appeared at appointments, and/or satisfied income and eligibility thresholds.  Additionally, all of Davi's written

work was reviewed and approved by a supervisor before its publication.  Thus, while the hearing officer role was public-facing and afforded Davi a part in reviewing appeals, there were also meaningful constraints on its scope and on the impact he could have.

As such, OTDA's burden remains high, particularly when the context and content of Davi's protected speech are taken into account. On balance, the government has failed to meet its burden here: On one hand, there was a narrow possibility of disruption; and on the other hand, the protected speech touched on a matter of public concern and was made in a manner that renders OTDA's burden high.  Accordingly, Davi's motion for partial summary judgment is granted, Defendants' motion for summary judgment on the First Amendment claim is denied, and Davi is entitled to reinstatement as a hearing officer.

## II.    Personal Capacity Claims

I next turn to Defendants' motions for summary judgment on the personal capacity claims, which contend that the remaining individual defendants are entitled to qualified immunity.

State employees may be held individually liable for damages under 42 U.S.C. § 1983 only if they were "personally involved in the alleged deprivation" of the plaintiff's rights. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004).  Personal involvement can be established by showing that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) (alteration in original) (quoting *Back*, 365 F.3d at 127).  The plaintiff must also establish that the individuals' actions "were the proximate cause of the plaintiff's constitutional deprivation." *Id.*

"A state actor charged under § 1983 with violating a plaintiff's constitutional rights is entitled to have the action dismissed on the basis of qualified immunity if at the time of the challenged conduct there was no 'clearly established law' that such conduct constituted a constitutional violation." *Lynch*, 811 F.3d at 578.  However, qualified immunity does not apply where there is evidence that the defendants' actual motive was to retaliate against the employee's speech rather than due to a concern about disruption. *See Locurto v. Safir*, 264 F.3d 154, 167, 169 (2d Cir. 2001) ("[I]t can never be objectively reasonable for a government official to act with the intent that is prohibited by law.").  Thus, qualified immunity is unavailable to the extent the plaintiff shows "particularized evidence of direct or circumstantial facts

supporting his claim of unconstitutional motive." *Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir. 1996) (internal quotation marks and citation omitted).

## A. Samuel Spitzberg and Sharon Devine

My prior decision determined that Samuel Spitzberg, OTDA's director, had both personal involvement and knowledge from which a jury could find that he acted with retaliatory intent. As explained there, Spitzberg: participated in the November 5 decision to suspend Davi; instructed another OTDA official to remove Davi from the hearing calendar; reviewed a sample of Davi's decisions and found no evidence of actual bias; and reached out to a contact at Legal Aid, who informed Spitzberg that he had not heard any "scuttlebutt" regarding OTDA's hearing officers. Yet, the notice of discipline charged Davi with actual bias. The prior decision explained that a jury could reasonably conclude that Spitzberg's decision to take adverse action against Davi, despite knowing of mitigating information in Davi's favor, was made with retaliatory intent. *See Davi*, 523 F. Supp. 3d at 311–12.

Likewise, the prior decision explained that Sharon Devine, then OTDA's executive deputy commissioner, had personal involvement and knowledge from which a jury could conclude that she acted with retaliatory intent. Devine's involvement included her participation in the November 5 meeting to suspend Davi and her approval of the notice of discipline. According to testimony from OTDA's general counsel, Devine and Spitzberg made the decision to issue the notice of

discipline together.  Similarly, Spitzberg testified that he "would not have issued the [notice of discipline] without Sharon Devine's approval."  ECF No. 90-5 at 90. Thus, as with Spitzberg, Devine was likely aware of the absence of actual bias or "scuttlebutt," such that a jury could reasonably conclude that her decision to nevertheless terminate Davi was taken in retaliation.  *See Davi*, 523 F. Supp. 3d at 312–13.

In their supplemental briefing, Defendants again contend that summary judgment should be granted to both Spitzberg and Devine because they are entitled to qualified immunity.  They point to evidence that OTDA officials acted not in retaliation, but rather out of genuine concern that Davi's comments would lead to disruption—namely, a set of emails sent among OTDA officials, including Spitzberg and Devine, soon after OTDA received the anonymous letter.  *See* ECF Nos. 90-17 to -20.  The emails indicate that OTDA officials were "concerned that Legal Aid may raise concerns, given the nature of the Facebook comments, that [Davi] is biased against the appellants that come before him and that decisions rendered against the appellants are not impartial."  ECF No. 90-18 at 2.  However, the emails that express such concern were sent *to* Spitzberg and Devine, not by them.  The emails sent by Devine on this email chain were purely administrative, *see* ECF No. 90-17, and Defendants do not point to any emails sent by Spitzberg that might indicate his intent.

As such, these emails bear little on either Spitzberg's or Devine's intent, and a jury could still find, based on the charge of actual bias despite their knowledge to the contrary, that each acted with retaliatory intent. Thus, neither is entitled to qualified immunity, and because there is also evidence of their personal involvement, the motions for summary judgment on the personal capacity claims against Spitzberg and Devine are denied.

### B. Eric Schwenzfeier

My prior decision determined that Eric Schwenzfeier, the assistant deputy commissioner for OTDA's Division of Administrative Services during the relevant time period, also had personal involvement and knowledge from which a jury could reasonably find retaliatory intent. Specifically, Schwenzfeier was personally involved insofar as he participated in the November 5 meeting where OTDA officials decided to remove Davi from hearing calendar and suspend him without pay. The record indicated that OTDA officials intended to suspend Davi, notwithstanding the results of any investigation. Schwenzfeier further stated in a deposition that, in OTDA's view, Davi's statements reflected "an actual bias." ECF No. 83-8 at 70. Based on this evidence, the decision explained, a jury could reasonably find that Schwenzfeier acted with retaliatory intent. *See Davi*, 523 F. Supp. 3d at 312.

In their supplemental briefing, Defendants raise two arguments. First, they contend that it was improper to have relied on Schwenzfeier's testimony to find a

factual dispute about his personal motive because that testimony was given pursuant to Federal Rule of Civil Procedure 30(b)(6), wherein Schwenzfeier spoke on behalf of OTDA.    Second, Defendants contend that Schwenzfeier had no personal involvement in the alleged First Amendment violation because he merely participated in a "collective" decision.

There remains sufficient evidence to create a factual dispute as to whether Schwenzfeier acted with retaliatory intent to deny summary judgment.  It may be correct that the 30(b)(6) testimony, which specifically addressed "[OTDA's] belief," cannot be attributed to Schwenzfeier's personal motives.  ECF No. 83-8 at 70; *see also* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2103 (3d ed. 2010) ("A deponent designated pursuant to Rule 30(b)(6) does not give his personal opinion, but rather presents the corporation's position on the topic.").   Nevertheless, the remaining evidence— Schwenzfeier's participation in the decision to suspend Davi, notwithstanding the results of any investigation—is, on its own, still enough to create a factual issue about his intent and preclude the defense of qualified immunity.

Additionally,  Schwenzfeier's  actions  constituted  sufficient  personal involvement to sustain a § 1983 claim.  That a decision was made by a group does not preclude finding personal involvement by an individual in that group. *See, e.g.*, *Polardo v. Adelberg*, No. 22-CV-2533, 2023 WL 2664612, at *9 (S.D.N.Y. Mar. 28,

2023) ("Given that the actions approved in these votes are central to several of Plaintiff's claims and that the . . . Defendants make decisions as a collective body, the Court finds Plaintiff has sufficiently alleged their personal involvement."); *Ruston v. Town Bd. for Town of Skaneateles*, No. 06-CV-927, 2009 WL 3199194, at *4 (N.D.N.Y. Sept. 30, 2009) ("Where the alleged deprivations occurred as a result of a board vote, involvement as a voting member of the board may be sufficient personal involvement."), *aff'd*, 610 F.3d 55 (2d Cir. 2010).  Moreover, in addition to participation in the collective decision, Schwenzfeier also "reviewed and discussed the Notice of Discipline prior to its issuance."  ECF No. 89 ¶ 5.  This direct participation also satisfies the personal involvement requirement.  Accordingly, the motion for summary judgment on the personal capacity claim against Schwenzfeier is denied.

## CONCLUSION

Davi's motion for partial summary judgment is granted.  Defendants' motions for summary judgment are denied.  The parties are directed to confer on a proposed order for Davi's reinstatement and should submit it within fourteen days.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York                  Edward R. Korman
May 29, 2024                        United States District Judge

30